IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:18-CV-00193

JOANNE ROGERS, BY AND THROUGH
HER GUARDIAN MARY ROGERS, AND
SUZANNA HARE,

                Plaintiffs,

    v.

MANDY COHEN, MD, IN HER OFFICIAL
CAPACITY AS THE SECRETARY OF THE
NORTH CAROLINA DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
ALLIANCE BEHAVIORAL HEALTHCARE,
and VAYA HEALTH,

                Defendants.

COMPLAINT AND APPLICATION FOR
PRELIMINARY AND PERMANENT
INJUNCTIVE RELIEF

## PARTIES

1.    Plaintiff JOANNE ROGERS ("Rogers") is a citizen and resident of Cumberland

County, North Carolina. Rogers has been determined to be legally incompetent and, in

accordance with Federal Rule of Civil Procedure 17(c), is represented by her Guardian of the

Person, Mary Rogers.

2.    Plaintiff SUZANNA HARE ("Hare") is a citizen and resident of Henderson

County, North Carolina.

3.    Defendant MANDY COHEN, MD ("Cohen"), is sued in her official capacity as

the Secretary of the North Carolina Department of Health and Human Services ("DHHS").

4.    Defendant ALLIANCE BEHAVIORAL HEALTHCARE ("Alliance") is a public

Medicaid managed care entity, operating as a Prepaid Inpatient Health Plan pursuant to 42 CFR

part 438, with its principal place of business in Durham, Durham County, North Carolina.

Alliance does business in North Carolina and has its principal office at 4600 Emperor Blvd #200, Durham, NC 27703.

5.      Defendant VAYA HEALTH ("Vaya") is a public Medicaid managed care entity, operating as a Prepaid Inpatient Health Plan pursuant to 42 CFR part 438, with its principal place of business in Asheville, Buncombe County, North Carolina. Vaya does business in North Carolina and has its principal office at 200 Ridgefield Court, Suite 206, Asheville, NC 28806.

## JURISDICTION AND VENUE

6.      This Court has subject jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the constitution, laws, or treaties of the United States.

7.      This Court has personal jurisdiction over each of the parties pursuant to Federal Rule of Civil Procedure 4(k) and N.C. GEN. STAT. § 1-75.4.

8.      Venue in this judicial district is proper under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because: (i) all defendants reside in North Carolina and defendant DHHS resides in this judicial district; and (ii)  a substantial portion of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

9.      Joinder of parties and claims is appropriate in this case pursuant to Federal Rule of Civil Procedure 20.

10.      No administrative remedies are available to plaintiffs, or attempts by plaintiffs to exhaust administrative remedies would be futile.

## FACTS

### The Medicaid Waiver

11.      Rogers is intellectually and physically disabled because of a rare genetic condition.

12. Hare is physically disabled because of cerebral palsy and other medical conditions.

13. Each plaintiff's conditions are chronic, and each plaintiff requires a very high level of care.

14. Each plaintiff's conditions are serious enough to qualify them for institutional placement; however, each plaintiff can thrive in a stable home environment with adequate support.

15. Each plaintiff receives Medicaid services under the North Carolina Innovations Waiver ("Waiver").

16. Medicaid is a cooperative program through which the federal government offers financial assistance to states allowing them to provide medical services to individuals with limited incomes. 42 U.S.C. § 1396–1.

17. If a state participates in Medicaid, it must comply with federally mandated standards. *Id.* § 1396a.

18. States may choose to provide additional, optional benefits.

19. The Waiver is a Home and Community Based Waiver approved under 42 U.S.C. § 1396n of the Medicaid Act that offers Medicaid services to individuals like plaintiffs with developmental disabilities who would otherwise qualify for services in an institutional facility.

20. The program at issue in this matter is called a "waiver" because, under the Medicaid Act, the federal Medicaid agency (the Centers for Medicare and Medicaid Service ("CMS")) has given North Carolina permission not to comply with certain otherwise mandatory provisions of the Medicaid Act.

21.     Medicaid Act provisions not specifically waived continue to apply in full force and effect for those enrolled in the Waiver program.

22.     North Carolina did not request waiver of, and the federal agency did not waive, the requirements of 42 U.S.C. §§ 1396a(a)(1) (statewide application) or (3) (due process requirements) as part of the Waiver, as amended.

**DHHS, DMA, Vaya and Alliance**

23.     DHHS has been designated as the "single state agency" with direct responsibility for administration of the state Medicaid plan. *See* 42 U.S.C. § 1396a(a)(5); N.C. GEN. STAT. §108A-54.

24.     DHHS's Division of Medical Assistance ("DMA") is responsible for the day to day administration of the Medicaid program.

25.     Alliance and Vaya are each multi-county area mental health, developmental disabilities, and substance abuse authorities.

26.     Alliance and Vaya are each local management entities ("LME"), which are defined by statute as local political subdivisions of the states. *See* N.C. GEN. STAT. § 122C-116(a).

27.     Defendant Vaya is the LME for, among other counties, Henderson County.

28.     Defendant Alliance is the LME for, among other counties, Cumberland County.

29.     Defendants Alliance and Vaya each operate as managed care organizations ("MCO") under the Medicaid regulations.

30.     DMA entered into a contract with each of Alliance and Vaya to arrange for and manage the delivery of services and to perform other Waiver operational functions through their prepaid inpatient health plan ("PIHP") for Medicaid recipients in their respective areas.

31.     Vaya and Alliance each operate as capitative healthcare providers. In other words, they each receive a fixed payment from the state of North Carolina for each Waiver participant in their catchment area.

32.     In exchange for the fixed payment, each of Vaya and Alliance is supposed to fund the provision of the statutorily available, medically necessary services and covered equipment, up to the $135,000 per participant budget maximum, for Waiver participants in their catchment area.

33.     Because MCOs like Vaya and Alliance get to keep the money they don't spend on Waiver participants, they have an incentive to cut services and cut costs at the expense of Waiver participants.

34.     Rogers receives Waiver services in Cumberland County, North Carolina. Rogers' LME/MCO/PIHP is Alliance.

35.     Hare receives Waiver services in Henderson County, North Carolina.  Hare's LME/MCO/PIHP is Vaya.

36.     Under the Innovations Waiver, participants meet with a MCO employee, called a care coordinator, once every twelve (12) months to develop a service plan of care in conjunction with the participant, any person the participant designates to help the participant, and the service provider (usually a company under contract with the MCO to provide services to the participant). This service plan of care, known as the Individual Support Plan ("ISP"), specifies the services requested to be authorized for the next twelve (12) month period.

37.     A participant's level of need and, thus, base budget amount for services provided under the Waiver, is determined using an "Individualized Budget Tool."

38.     The assessment instrument used to attempt to measure individual support needs is the Supports Intensity Scale (SIS).

39.     The SIS is alleged by the state to be "a valid, reliable instrument for assessing the level of an individual's support needs in major domains of daily living as well as behavioral and medical needs."

40.     Based almost exclusively on the SIS score, a participant is placed into one of several categories of "need."

41.     These categories of need are designated as Categories A through G, with "G" designating the highest level of perceived need and "A" designating the lowest level of perceived need.

42.     All Waiver participants are assigned to an Individualized Budgeting category on either the Residential Support Individualized Budgeting Tool (for those individuals who require residential services) or the Non-Residential Individualized Budgeting Tool (for those individuals who do not require residential services).

43.     A participant can receive "Base Budget Services" and "non-Base Budget Services" in a year. The combination of base budget and non-base budget services cannot exceed $135,000 per year.

44.     However, notwithstanding a participant's designated needs category, participants are to request and are entitled to receive the level of Waiver services that are medically necessary.  In other words, the budget category is supposed to operate as a guideline, not a maximum limit of spending.

45.     Participants are allowed by law to request, and LME/MCO's like Alliance and Vaya are required by law to inform participants that they should request, all available services,

equipment or modifications they believe are necessary, whether their care coordinator agrees with them or not, and whether the requested services would require funding that exceeds the limits of the participant's individualized budgeting category.

46.     The proposed ISP is then submitted to the MCO's Utilization Management section for review and approval or denial.

47.     If the proposed ISP is approved, the participant's twelve-month plan takes effect on the first day following the participant's month of birth.

48.     Services under the Waiver are authorized for one year when the annual plan of care is approved.

49.     Among other things, federal law requires that:

A State plan for medical assistance . . . must provide such methods and procedures relating to the utilization of, and payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with quality of care and are sufficient enough to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A).

50.     Federal law also requires:

a.      That any decision to deny a service authorization request or to authorize a service in an amount, duration, or scope that is less than requested, be made by a health care professional who has appropriate clinical expertise in treating the enrollee's condition or disease.

b.      If a participant's request is denied in whole or in part, that the participant be given a notice of adverse determination. Specifically, notices of adverse determination must be sent whenever there is any decision by the MCO,

PIHP, or PAHP to deny a service authorization request, or to authorize a service in an amount, duration, or scope that is less than requested.

*See*, 42 CFR § 438.210.

51.     Federal law defines an "action" to include, among other things, "the denial or limited authorization of a requested service, including the type or level of service;" "the reduction, suspension or termination of a previously authorized service;" or "the denial, in whole or in part, of payment for a service."  *See*, 42 CFR § 438.400.

52.     Federal law requires that an MCO or PIHP provide notice of any "action" to participants.  *See* 42 CFR 438.404.

53.     The notice of action must explain:

    a.     The action the MCO or PIHP or its contractor has taken or intends to take.

    b.     The reasons for the action.

    c.     The enrollee's or the provider's right to file an MCO or PIHP appeal.

    d.     If the State does not require the enrollee to exhaust the MCO or PIHP level appeal procedures, the enrollee's right to request a State fair hearing.

    e.     The procedures for exercising the specified rights.

    f.     The circumstances under which expedited resolution is available and how to request it.

    g.     The enrollee's right to have benefits continue pending resolution of the appeal, how to request that benefits be continued, and the circumstances under which the enrollee may be required to pay the costs of these services.

*Id.*

54.     Federal law requires that a State plan provide an opportunity for a fair hearing to any person whose claim for assistance is denied or not acted upon promptly and requires Medicaid MCOs to establish internal grievance procedures under which Medicaid enrollees, or providers acting on their behalf, may challenge the denial of coverage of, or payment for, medical assistance. *See* 42 USC §§1902(a)(3) and 1932(b)(4).

55.     As the head of DHHS, the single state agency responsible for administering the Medicaid program in North Carolina, defendant Cohen is accountable for the administration of the Medicaid program through contracts with defendants Alliance and Vaya.

**Rogers' Waiver Requests**

56.     Rogers has profound physical disabilities, moderate to severe intellectual disabilities, and exceptional medical needs because of a rare genetic condition.

57.     Rogers has extremely high levels of need and requires medically necessary, one-on-one attention throughout the day, evening, and night to live safely in the community.

58.     For example, as a result of her rare chromosomal abnormalities, Rogers has, among other medical issues: autism; chronic immune dysfunction; recurrent otitis media; osteoporosis unspecified; esophagitis; dysplastic nevus; elevated liver enzymes; history of anemia unspecified; herpes zoster; dysarthria; dysphagia; chronic obstructive asthma; allergic rhinitis; dermatitis; keratosis, seborrheic; umbilical hernia; bowel incontinence; urinary incontinence; gastroesophageal reflux disease; multiple spleenic infarctions; celiac disease; visual impairment; hearing loss due to myringotomy surgical procedures; bruxism; history of cholesteatoma unspecified; anxiety state unspecified; unspecified extrapyramidal disease/abnormal movement disorder; sensory integration disorders; palate/internal structures of

mouth, complicated; situational hypertension; and adjustment disorder with depressed mood/grief reaction.

59. Because of Sensory Integration Disorder, Rogers is prone to engage in self injurious behavior, which may produce bruising and/or open wounds to her chest, arms, hands, and upper/lower legs.

60. Rogers must be taken to the hospital at least every three weeks to receive gamma globulin intravenously for treatment of her immune system dysfunction.

61. The above medical conditions, medical professionals Rogers must see regularly, daily medications she must take, and her inability to independently perform almost all activities of daily living, require her to have total care, nearly 24 hours per day.

62. Rogers relies on the benefits she receives under the Waiver to live, to stay in the community, and to maintain the least restrictive environment for her.

63. Given Rogers' fragile health, she likely would not survive placement in a group home or institutional setting.

64. Rogers has historically been authorized under the Waiver to receive Alternative Family Living ("AFL") services.

65. AFL services allow an individual to live in the home of a qualified person. That person receives payments under the Waiver in exchange for providing care for the Waiver participant, 24 hours per day seven days per week.

66. Some Waiver participants require much more supervision and care than other Waiver participants. Stated differently, it is much harder and requires more skill to care for some Waiver participants than others because of the amount of monitoring and other attention that must be provided.

67.     Rogers' annual budget for Waiver services was and is well below the $135,000 maximum for a plan participant.

68.     Given Rogers' extremely high level of need and medical conditions, it is much more difficult to provide services for Rogers and requires more skill to provide those services, than for most other Waiver participants in an AFL setting.

69.     Given Rogers' high level of care and the amount of work necessary to care for her, almost 24 hours per day, Rogers is at risk of losing her AFL provider and of being institutionalized if her AFL provider is not paid a rate that is higher than the rate paid to AFL providers of less demanding Waiver participants.

70.     Given Rogers' very high level of need, it will be difficult or impossible to locate other AFL providers willing and competent to provide services for Rogers at the rates normally paid to AFL providers who care for less demanding Waiver participants.

71.     Given the amount of work and expertise necessary to care for Rogers, in August 2017, Rogers, through her provider agency, submitted to Alliance a formal request for a higher daily rate on an Alliance-generated document entitled Rate Consideration Request.

72.     Rogers made the request for a higher daily rate, referred to as a request for an "enhanced rate," in the proposed ISP for Rogers' current plan year.

73.     Even if the proposed enhanced rate had been approved, Rogers' budget would have been significantly less than the $135,000 per year allowed under the Waiver.

74.     Alliance denied Rogers' requests for an enhanced rate.

75.     Alliance failed and refused to provide Rogers a notice of action regarding its denial of her request for an enhanced rate.

76. Alliance told Rogers through her provider agency that she had no right to appeal Alliance's denial of her request for an enhanced rate.

77. Rogers' request for an enhanced rate for her caregivers was adequately documented, properly supported by evidence indicating the necessity for such a rate, and should have been approved.

78. Alliance's denial of Rogers' request for an enhanced rate places her at imminent risk of institutional placement.

79. DHHS has ratified Alliance's illegal conduct by affirmatively stating its belief that rate determinations are within the LME/MCO's discretion and that a decision to deny an enhanced rate does not require a notice of action.

80. On information and belief, enhanced rates are available and are paid to caregivers of many Waiver recipients with high levels of needs across the state of North Carolina.

81. On information and belief, Alliance has no standards or policies in place to determine when the payment of an enhanced rate is appropriate or the amount of an enhanced rate that might be necessary to fairly compensate an AFL provider who provides services to a Waiver recipient with very high levels of needs.

**Hare's Waiver Request**

82. Hare has profound physical disabilities and exceptional medical needs because of cerebral palsy and related medical conditions.

83. Hare has extremely high levels of need and requires medically necessary, one-on-one attention throughout the day to live safely in the community.

84.     Because of her cerebral palsy, Hare has a very limited ability to move and to care for herself.  She cannot put herself to bed or get out of bed, and she has a difficult time making any but the smallest of physical movements on her own.

85.     Hare's caregivers and Hare use a lift to get her into bed at night and to get her out of bed and into her wheelchair during the day.

86.     Hare must be repositioned frequently throughout the day, including laying her on alternate sides frequently, to promote circulation, relieve pain, and reduce the likelihood of bedsores.

87.     Hare's caregivers must be well-trained and familiar with her medical needs because they can cause significant injury to her by lifting her or repositioning her incorrectly.

88.     For example, in 2010, the ball of Hare's hip was rubbing on her pelvic bone, causing immense pain. The ball of her hip was removed and the muscles and tendons were reattached.  Hare requires full support so as not to dislocate her hip joints due to improper lifting. If her caregivers are not well-trained and careful, they can cause injury to her by moving her incorrectly.

89.     Hare is prone to stress fractures, which also requires extra care and training on behalf of her caregivers.

90.     Hare has asthma and allergies; is prone to bladder infections; had surgery in 2006 to receive a baclofen pump; in 2012 had another surgery to replace the pump with a larger one; has failure to thrive; and suffers from chronic insomnia.

91.     A baclofen pump (ITB Therapy) is a precise, targeted therapy used to reduce severe spasticity that may result from a spinal cord injury or other forms of paralysis. It uses a programmable, battery-powered medical device that stores and delivers a prescription

medication called baclofen. The device is surgically implanted in the abdomen and a thin, flexible silicone tube called a catheter is inserted near the spine and connected to the pump.

92.     The baclofen pump must be monitored and maintained because serious consequences, including death, can result if it is allowed to run out of medicine or malfunctions.

93.     Hare must be taken to her neurologist every 4 to 8 weeks to have the pump refilled with the medication.

94.     Hare must be taken to her primary care doctor every three months for monitoring of her use of the medication that helps her cope with her insomnia.

95.     Hare must be taken to a nutritionist on a regular basis to monitor her diet and to ensure that she is receiving adequate nutrition.

96.     Hare must be catheterized every 2 to 3 hours and has a colostomy which needs routine attention.

97.     Hare's caregivers must feed her through a G-tube several times a day, which means they have to prepare the nutritional supplement and maintain the G-tube.

98.     Hare must complete range of motion exercises every day with assistance from her caregivers. Her doctor has recommended that before she begins her exercise routine, she receive a massage and that she be given hot soaks or be wrapped in warm towels or a warm blanket.

99.     Hare is medically fragile and must be monitored closely. She has experienced episodes of seizures and brain swelling in the past.

100.    While Hare can remain healthy for extended periods of time, her health can deteriorate quickly resulting in hospitalization if she is not monitored closely.

101.    The above medical conditions, medical professionals Hare must see regularly, daily medications she must take, and her inability to independently perform most activities of daily living, require her to have total care, nearly 24 hours per day.

102.    Hare began living in an AFL setting in 2017.

103.    Vaya approved in 2017 an enhanced rate for her AFL providers.

104.    During 2017, Hare received a new SIS score, which was higher than it had been in previous years.  The higher SIS score is a recognition of the fact that Hare's level of need has increased.

105.    In December 2017, working in conjunction with her provider agency, Hare's provider agency submitted a formal request for an enhanced rate on a Vaya-generated document entitled "Provider Rate Request Form."

106.    Notwithstanding the fact that Vaya approved an enhanced rate in 2017 and that Hare's level of need had increased as demonstrated in part by her increased SIS score, Vaya declined her request for an enhanced rate for her AFL providers.

107.    Given Hare's high level of care and the amount of work necessary to care for her, almost 24 hours per day, Hare is at imminent risk of losing her AFL provider and of being institutionalized if her AFL provider is not paid a rate that is higher than the rate paid to AFL providers of less demanding Waiver participants.

108.    Given Hare's very high level of need, it will be difficult or impossible to locate other AFL providers willing and competent to provide services for Hare at the rates normally paid to AFL providers who care for less demanding Waiver participants.

109.    Even if the proposed enhanced rate had been approved, Hare's budget would have been significantly less than the $135,000 per year allowed under the Waiver.

110.     Vaya failed and refused to provide Hare a notice of action regarding its denial of her request for an enhanced rate.

111.     Vaya told Hare that she had no right to appeal its denial of her request for an enhanced rate.

112.     Even though Vaya told Hare she had no right to appeal, Hare filed a grievance with Vaya concerning its denial of her request for an enhanced rate.

113.     Shortly after she filed her grievance, Vaya advised her that it would not change its decision.

114.     Vaya's denial of Hare's request for an enhanced rate places her at imminent risk of institutional placement.

115.     DHHS has ratified Vaya's illegal conduct by affirmatively stating its belief that rate determinations are within the LME/MCO's discretion, and that a decision to deny an enhanced rate does not require a notice of action.

116.     On information and belief, enhanced rates are available and are paid to caregivers of many Waiver recipients with high levels of needs across the state of North Carolina.

117.     On information and belief, Vaya has no standards or policies in place to determine when the payment of an enhanced rate is appropriate or the amount of an enhanced rate that might be necessary to fairly compensate an AFL provider who provides services to a Waiver recipient with very high levels of needs.

118.     Hare's request for an enhanced rate for her caregivers was adequately documented, properly supported by evidence indicating the necessity for such a rate and should have been approved.

**DHHS's Abrogation of Responsibility/Statewide Disparity**

119.    DHHS is the "single state agency" with direct responsibility for administration of the state Medicaid plan. *See* 42 U.S.C. § 1396a(a)(5); N.C. Gen. Stat. §108A-54.

120.    The single state agency requirement is meant to ensure that final authority to make the many complex decisions governing a state's Medicaid program is vested in one (and only one) agency.

121.    The requirement is meant to avoid the disarray that would result if multiple state or even local entities were free to render conflicting determinations about the rights and obligations of beneficiaries and providers.

122.    Implicit in the single state agency rule is the corollary requirement that only that agency may administer a state's Medicaid program.

123.    In this regard, 42 C.F.R. §431.10(e) specifically provides that "[t]he Medicaid agency may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters."

124.    DHHS has abrogated its responsibility as the single state agency by, among other things, failing and refusing to issue guidelines and policies on addressing requests for enhanced rates for caregivers who care for participants with higher than ordinary levels of need; by allowing inconsistency and disarray among various counties in North Carolina and the various LME/MCOs in North Carolina regarding the availability of and payment of enhanced rates; and not fulfilling its obligations under federal law to require LME/MCOs to provide notices of action when required.

125.     DHHS's abrogation of its responsibility has led to confusion and inconsistent access to resources throughout the state and the denial of substantive rights to Waiver participants.

126.     For example, Rogers' MCO told her guardian for years that enhanced rates were not available in Cumberland County, while Hare, who lives in Henderson County and is served by another MCO, received an enhanced rate for her provider in a year when Rogers had been informed that such rates were not available.

127.     Furthermore, on information and belief, LME/MCOs like Vaya and Alliance do not have policies or guidelines on when enhanced rates are available or under what circumstances they should be paid to ensure that recipients with higher levels of need are able to receive care from qualified providers who may be unwilling to work for lower rates.

128.     Alternatively, if LME/MCOs like Vaya and Alliance do have policies or guidelines on when enhanced rates are available and under what circumstances they should be paid to ensure that recipients with higher levels of need are able to receive care from qualified providers who may be unwilling to work for lower rates, such guidelines are inconsistent from county to county and LME/MCO to LME/MCO.

129.     Alternatively, if LME/MCOs like Vaya and Alliance do have policies or guidelines on when enhanced rates are available and under what circumstances they should be paid, they ignore them and pay such rates in an arbitrary and capricious manner, based on their whim and fancy.

130.     It is DHHS's responsibility as the single state agency to ensure that uniform guidelines are in place and are enforced across the state, and it has wholly abrogated its duty with respect to the issue of enhanced rates for participants with particularly high levels of needs.

## FIRST CLAIM FOR RELIEF
## Denial of Procedural Due Process Under the
## United States Constitution

131.    Plaintiffs incorporate herein the preceding allegations.

132.    To comport with due process requirements, a State Medicaid program must use reasonable, ascertainable, non-arbitrary standards and procedures for determining eligibility for and the extent of medical assistance provided.

133.    As set forth above, as a result, among other things, of DHHS's failure to fulfill its obligation as the single state agency to monitor and supervise the implementation of the Waiver, there are no reasonable, ascertainable, non-arbitrary standards or reasonable procedures for determining eligibility for and the extent to which enhanced rates are available to providers for Waiver recipients with exceptional needs.

134.    42 U.S.C. § 1396a(a)(30)(A) creates an entitlement in plaintiffs to the substantive rights of quality of care and equal access to medical services.

135.    The failure of defendants to provide for a uniform, statewide system to determine whether or when enhanced rates are available for providers who provide services for Waiver recipients with exceptional needs is depriving plaintiffs of the substantive rights of quality of care and equal access to medical services.

136.    In addition, each plaintiff had and has cognizable liberty or property interest in Waiver benefits. Each plaintiff suffered the deprivation of that interest by state action, and the procedures employed were constitutionally inadequate.

137.    Each plaintiff has suffered actual damages and faces the prospect of the loss of personal liberty because of the joint and several and collective actions of defendants.

## SECOND CLAIM FOR RELIEF
### Denial of Substantive Due Process Under the
### United States Constitution

138.    Plaintiffs incorporate herein the preceding allegations.

139.    Defendants have violated plaintiffs' substantive due process rights.

140.    Individuals receiving, applying for, or in need of I/DD ("Intellectual/ Developmental Disability") services have a liberty interest in receiving services in the least restrictive setting appropriate to their needs, in receiving services outside of segregated or institutional settings, and in not being placed at risk of segregation or institutionalization.

141.    By denying plaintiffs' requests for enhanced rates for their caregivers, and based on the other facts set forth above, defendants have infringed the plaintiffs' liberty interests and placed them at risk of institutionalization.

## THIRD CLAIM FOR RELIEF
### Violations of Title II of the ADA

142.    Plaintiffs incorporate herein the preceding allegations.

143.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

144.    Although the ADA "does not require a public entity to provide to individuals with disabilities . . . services of a personal nature including assistance in eating, toileting, or dressing," a state that decides to provide these services must do so "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id.;* 28 C.F.R. §§ 35.130(d) and 35.135.

145.     Pursuant to federal regulations, the most integrated settings are those that enable individuals with disabilities to interact with nondisabled persons to the fullest extent possible.

146.     As set forth above, each plaintiff has exceptionally high needs.

147.     Each plaintiff requested an enhanced rate for her care providers because of the much greater amount of work and skill required to care for her than for other Waiver recipients in an AFL environment.

148.     Even if each plaintiff's request for an enhanced rate had been approved, expenditures for each plaintiff's services under the Waiver would have been well within the maximum $135,000 per year budget.

149.     Defendants' denials of plaintiffs' request for enhanced rates for their service providers places them at real and imminent risk of institutionalization.

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 504 of the Rehabilitation Act**

150.     Plaintiffs incorporate herein the preceding allegations.

151.     Each plaintiff is a "qualified person with a disability" within the meaning of Section 504, because they (1) have physical and/or mental impairments that substantially limit one or more major life activities and (2) meet the essential eligibility requirements for North Carolina Medicaid.

152.     Defendants conduct, operate, and/or administer the state Medicaid program, are recipient of federal funds, and therefore are subject to the requirements of Section 504.

153.     Section 504 of the Rehabilitation Act (29 U.S.C. § 794) imposes the same integration requirements as the ADA.

154.     Defendants' denial of coverage for the services that plaintiffs require in order to avoid segregation in institutional placements and to remain in integrated home settings that are

appropriate to their needs constitutes unlawful discrimination in violation of Section 504 of the Rehabilitation Act.

155. Defendant has utilized criteria and methods of administration that subject plaintiffs to discrimination on the basis of disability, including unnecessary institutionalization, by failing to ensure that plaintiffs have access to Medicaid-covered personal care services that meet their needs in the community.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Persons with Disabilities Protection Act**
**(N.C. Gen. Stat. § 168A-1, et seq.)**

156. Plaintiffs incorporate herein the preceding allegations.

157. Defendants are "covered governmental entities" as defined in the Persons with Disabilities Protection Act.

158. The Persons with Disabilities Protection Act requires, among other things, that a covered governmental entity shall administer it services, programs, and activities in the most integrated setting appropriate to the needs of persons with disabilities.

159. Through their actions, defendants have violated various provisions of the Persons with Disabilities Protection Act.

**SIXTH CLAIM FOR RELIEF**
**Medicaid Comparability**

160. Plaintiffs incorporate herein the preceding allegations.

161. Defendants have instituted rules, policies, and procedures that will reduce, suspend, deny, or terminate services for plaintiffs based on their differing places of residence within North Carolina, while other persons with similar extensive needs will receive differing and more favorable services because they live in different areas of North Carolina.

162.     Defendants, by creating varying and inconsistent eligibility standards for enhanced rates, are violating the federal Medicaid comparability requirement.    42 U.S.C. § 1396a(a)(10)(B).

### SEVENTH CLAIM FOR RELIEF
### Medicaid Reasonable Standards

163.     Plaintiffs incorporate herein the preceding allegations.

164.     Federal law requires states participating in Medicaid include reasonable standards which shall be comparable for all groups.  42 U.S.C. § 1396a(a)(17).

165.     Defendants' failure to have reasonable standards in place means that some LME/MCOs pay enhanced rates for caregivers for some Waiver participants while some LME/MCOs deny it to other Waiver recipient caregivers with similar needs based on geographic location within the state or the whim of the particular LME/MCO.

166.     Provisions of the Waiver that allow LME/MCOs to determine rates paid to providers without any guidance from DHHS or statewide consistency are inconsistent with and in conflict with the reasonable standards requirement of the federal Medicaid Act, 42 U.S.C. § 1396a(a)(17), and interpretive federal guidelines, and are therefore preempted pursuant to the Supremacy Clause of the U.S. Constitution, art. IV.

### EIGHTH CLAIM FOR RELIEF
### Declaratory Judgment Pursuant to
### 28 USC § 2201(a)

167.     Plaintiffs incorporate herein the preceding allegations.

168.     A dispute has arisen and an actual controversy exists between plaintiffs, on the one hand, and defendants, on the other hand, concerning whether defendants are violating plaintiffs' statutory and constitutional rights.

169.     Because an actual controversy exists between plaintiffs and defendants plaintiffs seek a declaration, among other things, that: (i) Vaya's and Alliance's conduct constituted an "action" as defined by federal law and rule; (ii) Vaya and Alliance violated state and federal law by failing to issue notices of action; (iii) DHHS has violated state and federal law by failing to fulfill its obligations as the single state agency, by failing to require reasonable Medicaid standards and Medicaid comparability; (iv) defendants have collectively violated the applicable provisions of the ADA, the Rehabilitation Act and the Persons with Disabilities Protection Act; and (v) defendants have denied plaintiffs their procedural and substantive due process rights.

**NINTH CLAIM FOR RELIEF**
**Preliminary and Permanent Injunction**
**42 U.S.C. § 1983 and Fed. R. Civ. P. 65**

170.     Plaintiffs incorporate herein the preceding allegations.

171.     Plaintiffs face a real and imminent threat of irreparable injury because of defendants' conduct.

172.      Injunctive relief is appropriate to prevent irreparable injury by requiring defendants to comply with applicable state and federal laws, compliance with which would avoid irreparable injury to plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Issue a declaratory judgment pursuant to 28 USC § 2201(a) declaring that: (i) Vaya's and Alliance's conduct constituted an "action" as defined by federal law and rule; (ii) Vaya and Alliance violated state and federal law by failing to issue notices of action; (iii) DHHS has violated state and federal law by failing to fulfill its obligations as the single state agency, by failing to require reasonable Medicaid standards and Medicaid comparability; (iv) defendants have collectively violated the applicable provisions of the ADA, the Rehabilitation Act and the

Persons with Disabilities Protection Act; and (v) defendants have denied plaintiffs their procedural and substantive due process rights.

2.    Grant a preliminary and permanent injunction requiring:

    a.    Cohen, her agents, successors, and employees, including Vaya and Alliance, to fulfill her obligations as the single state agency to enact reasonable Medicaid standards and Medicaid comparability;

    b.    Cohen, Vaya and Alliance to comply with the applicable provisions of the ADA, the Rehabilitation Act and the Medicaid Act; and

    c.    Cohen, Vaya and Alliance to afford plaintiffs their procedural and substantive due process rights under the U.S. and North Carolina Constitutions and the Medicaid Act; and

    d.    Vaya and Alliance to pay an appropriate enhanced rate to plaintiffs' caregivers effective as of the date such a rate should have been paid after having been requested by plaintiffs.

3.    Retain jurisdiction over this action to insure Defendants' compliance with the mandates of the Court's Orders;

4.    Award to the Plaintiffs costs and reasonable attorney fees pursuant to 42 U.S.C. §§ 1988 and 12133, and 28 USC § 794a; and

5.    Order such other relief, specific or general, legal or equitable, to which plaintiffs may show themselves justly entitled.

This 2nd day of May, 2018.

ALEXANDER RICKS PLLC

 /s/ Rodney E. Alexander
Rodney E. Alexander, Esq.
N.C. State Bar No.:  23615
rodney@alexanderricks.com
(704) 365-3614

Mary K. Mandeville, Esq.
N.C. State Bar No.:  15959
mary@alexanderricks.com
(704) 200-2635

4601 Park Rd., Suite 580
Charlotte, North Carolina 28209
Facsimile:      (704) 365-3676

*Attorney for Plaintiffs*