IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CV-193-D

JOANNE ROGERS, by and through )
her Guardian MARY ROGERS, and )
SUZANNA HARE, )
 )
              Plaintiffs, )
 ) **ORDER**
     v. )
 )
MANDY COHEN, et al., )
 )
             Defendants. )

On May 2, 2018, Joanne Rogers ("Rogers"), by and through her guardian Mary Rogers, and Suzanna Hare ("Hare"; collectively, "plaintiffs") filed a complaint against Dr. Mandy Cohen ("Cohen"), in her official capacity as the Secretary of the North Carolina Department of Health and Human Services, Alliance Behavioral Healthcare ("Alliance"), and Vaya Health ("Vaya"; collectively, "defendants") [D.E. 1]. On June 28, 2018, Cohen moved to dismiss the complaint for failure to state a claim or for lack of jurisdiction [D.E. 23] and filed a memorandum in support [D.E. 24]. On June 29, 2018, Alliance and Vaya moved to dismiss the complaint [D.E. 26] and filed a memorandum in support [D.E. 27].

On July 26, 2018, plaintiffs filed an amended complaint [D.E. 36]. Plaintiffs raise numerous claims: (1) denial of procedural due process, (2) denial of substantive due process, (3) violations of Title II of the Americans with Disabilities Act ("ADA"), (4) violations of Section 504 of the Rehabilitation Act, (5) violation of the North Carolina Persons with Disabilities Protection Act, (6) violation of the Medicaid Act's comparability requirement, (7) violation of the "statewidedness" requirements of 42 U.S.C. § 1396a(a)(1), and (8) violation of the Medicaid reasonableness standards.

See id. Plaintiffs seek declaratory and injunctive relief. See id. On August 27, 2018, Cohen moved to dismiss the amended complaint for failure to state a claim or for lack of jurisdiction [D.E. 40] and filed a memorandum in support [D.E. 41]. On the same day, Alliance and Vaya moved to dismiss the amended complaint [D.E. 42] and filed a memorandum in support [D.E. 45]. On November 16, 2018, plaintiffs responded in opposition [D.E. 53, 54].[1] On December 14, 2018, defendants replied [D.E. 57, 58]. As explained below, the court grants defendants' motions to dismiss.

I.

Hare and Rogers both have exceptional medical needs. See Am. Compl. [D.E. 36] ¶¶ 11, 35. Hare has cerebral palsy, which, along with related medical conditions, has caused her to be profoundly physically disabled. See id. ¶ 11. Hare requires constant individualized attention to meet her "extremely high" levels of medical need. Id. ¶ 12. For example, Hare has "a very limited ability to move," and caregivers must carefully move her throughout the day to relieve pain, promote circulation, and reduce the likelihood of bedsores. Id. ¶¶ 13–18. Hare's caregivers must be present at all hours to monitor her feeding and baclofen pumps, catheters, and colostomy and to be able to move Hare in the event of an emergency. See id. ¶¶ 19–27. In short, Hare is "medically fragile" and, because her health can "deteriorate quickly resulting in hospitalization," she requires "total care nearly 24 hours per day." Id. ¶¶ 32–34.

Rogers has a rare chromosomal abnormality, known as "karyotyped 4Q-;10Q+," which has caused numerous medical issues that cause her to be intellectually and physically disabled. See id. ¶¶ 35, 37 (listing at least 31 medical issues that result from Rogers's rare chromosomal abnormality). Like Hare, Rogers requires extremely high levels of one-on-one care nearly 24 hours per day. See

---

[1] On the same day, plaintiffs also voluntarily dismissed counts five and eight [D.E. 50].

id. ¶¶ 36, 40–44. For example, Rogers follows a strict daily routine and any disruption can trigger self-injurious behavior. See id. ¶¶ 38–39. Moreover, Rogers is generally unable to "independently perform almost all activities of daily living." Id. ¶ 44.

Both Rogers's and Hare's chronic medical problems qualify them for institutional placement. See id. ¶¶ 45–46. Neither, however, wishes to be placed in an institutional setting because both can thrive in an integrated setting with available medical resources and services. See id. ¶¶ 46, 48. Moreover, because Rogers suffers from chronic immune dysfunction, she would be at extreme risk of exposure to disease in an institution. See id. ¶ 47. Accordingly, both Hare and Rogers want to remain in their current communities instead of an institution. See id. ¶ 48.

Both Hare and Rogers receive Medicaid services under the North Carolina Innovations Waiver (the "Waiver"). See id. ¶ 49. "The Medicaid Act authorizes states to obtain Home and Community Based Services waivers" with approval from the Centers for Medicare and Medicaid Services. Id. ¶ 53. Plaintiffs receive services under a Home and Community Based Services waiver "that offers Medicaid services to individuals like plaintiffs with developmental disabilities who would otherwise qualify for services in an institutional facility." Id. ¶ 54; see id. ¶ 56. As part of the Waiver, the comparability requirements are waived and replaced with services specified in the waiver application. See id. ¶¶ 58–59.

In North Carolina, the Department of Health and Human Services ("DHHS") administers the state Medicaid plan, and DHHS's Division of Medical Assistance ("DMA") directs "the day-to-day administration of the Medicaid program." Id. ¶¶ 62–63. Alliance and Vaya operate as managed care organizations ("MCOs"). See id. ¶ 66. DMA contracted with Alliance and Vaya "to arrange for and manage the delivery of services and to perform other Waiver operational functions through their respective, prepaid inpatient health plans . . . for Medicaid recipients." Id. ¶ 67. North Carolina

3

provides capitated payments for each Waiver participant to Vaya and Alliance. See id. ¶¶ 70–71; Reuss Aff. [D.E. 44] ¶ 5; Goodfellow Aff. [D.E. 47] ¶ 3. Plaintiffs allege that the nature of capitated payments incentivizes Alliance and Vaya to cut services and costs unnecessarily or to eliminate expensive Waiver participants from the system. See Am. Compl. [D.E. 36] ¶¶ 72–73.

Under the Waiver program, Vaya and Alliance do not provide healthcare services directly, but instead they contract with provider agencies to "provide caregivers and other services for Waiver participants." Id. ¶ 74; see Reuss Aff. [D.E. 44] ¶ 6; Goodfellow Aff. [D.E. 47] ¶ 4. The provider agency contracts with the MCO "for the hours or days a caregiver works for a Waiver participant, and the provider agency pays the caregiver for the hours the caregiver works." Am. Compl. [D.E. 36] ¶ 75. The provider agency retains some of the funds it receives from the MCO. See id. ¶¶ 76–78. Plaintiffs allege that, although the MCO contracts directly with the provider agency, Waiver participants are "always the beneficiary of the services request and approved and of any payments." Id. ¶ 80. Vaya and Alliance contend, however, that they are not responsible for payments to caregivers. See Reuss Aff. [D.E. 44] ¶ 15 ("Vaya does not control the rates [that a provider] pays it[s] direct care staff."); Goodfellow Aff. [D.E. 47] ¶ 5 ("Alliance controls only the rate at which it reimburses network providers; it has no control over the rates at which a provider pays its direct care staff who deliver services to members.").

Waiver participants meet annually with an MCO to assess eligibility for Waiver services and to develop an Individual Support Plan ("ISP"), which includes a Waiver participant's annual budget. See Am. Compl. [D.E. 36] ¶ 81. The ISP "specifies the services requested to be authorized for the next twelve month period." Id. Waiver participants "are entitled to receive the level of Waiver services that are medically necessary," and the program sets a guideline maximum amount of $135,000 per year. See id. ¶¶ 83–89; Parker Aff. [D.E. 46] ¶¶ 5–8. Plaintiffs allege that DMA

policy 8-P details the process by which Waiver participants "may request enhanced pay rates for caregivers." Am. Compl. [D.E. 36] ¶¶ 90–91.

Rogers's MCO is Alliance. See id. ¶ 102. Under the Waiver program, Rogers has received Alternative Family Living ("AFL") services, which allow Rogers to live in the home of her caregiver and receive care at all times. See id. ¶¶ 105–07. The care that Rogers receives is extremely demanding. See id. ¶¶ 109–10. Because of the level of care that Rogers requires, Rogers's caregiver has indicated that she will stop providing services to Rogers if she is not paid more. See id. ¶¶ 111–12. If that occurred, Rogers alleges that it would be difficult or impossible to locate a replacement for her current caregiver given the nature of the care that she requires. See id. ¶¶ 113–14.

In August 2017, Rogers's mother and guardian of the person ("GOP"), Mary Rogers, submitted a formal request for a higher daily rate for Rogers's caregiver through New Beginnings of North Carolina, LLC ("New Beginnings"), Rogers's provider agency at the time. See id. ¶¶ 115, 119–22. Rogers alleges that her Waiver services have been "well below the $135,000 maximum for a plan participant," id. ¶ 108, and that even with the requested enhanced rate, Rogers's budget would have been less than $135,000. See id. ¶ 125. Nonetheless, Alliance denied Rogers's request for an enhanced rate. Id. ¶ 124. Plaintiffs allege that Alliance did not provide to Rogers a notice of action concerning the denial and that Alliance told New Beginnings that Rogers did not have a right to appeal its decision outside of Alliance's internal grievance process. See id. ¶¶ 126–27, 130–33. However, Alliance approved Rogers for all services requested. See Parker Aff. [D.E. 46] ¶¶ 23–24.

Hare's MCO is Vaya, and Hare's provider agency was formerly New Beginnings. See Am. Compl. [D.E. 36] ¶¶ 136–37. Hare began receiving AFL services in 2017. See id. ¶¶ 138–41. Hare's sister and brother-in-law serve as Hare's AFL caregivers, and Vaya approved Hare for an

5

enhanced rate for her AFL caregivers in 2017. See id. ¶ 142, 176. Like Rogers, Hare is at risk of losing her AFL caregivers unless they are paid a higher rate each year. See id. ¶¶ 154–55. In December 2017, New Beginnings submitted a formal request to Vaya for an enhanced rate for Hare's caregivers for 2018. See id. ¶¶ 145–46. Vaya denied Hare's request even though Hare's medical needs had increased during 2017. See id. ¶¶ 153, 156–58. As with Rogers, plaintiffs allege that Vaya did not provide a notice of action to Hare, and Vaya told Hare that she had no right to appeal other than Vaya's internal grievance process. See id. ¶¶ 159–61, 164–66. Hare filed a grievance, and Vaya upheld its decision. Id. ¶ 162. Notably, Hare and Rogers have not been denied service.

On July 1, 2018, New Beginnings ceased working as Hare's and Rogers's provider. See id. ¶ 137; Parker Aff. [D.E. 46] ¶ 26; Smith Aff. [D.E. 43] ¶¶ 20, 29. Hare and Rogers have yet to submit a request for an enhanced rate through their new providers. See Am. Compl. [D.E. 36] ¶¶ 134, 152.

II.

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure tests subject-matter jurisdiction, which is the court's "statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted); see Holloway v. Pagan River Dockside Seafood, Inc., 669 F.3d 448, 453 (4th Cir. 2012); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479–80 (4th Cir. 2005). A federal court "must determine that it has subject-matter jurisdiction over the case before it can pass on the merits of that case." Constantine, 411 F.3d at 479–80. As the party invoking federal jurisdiction, plaintiffs bear the burden of establishing that this court has subject-matter jurisdiction. See, e.g., Steel Co., 523 U.S. at 104; Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999); Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). In considering

a motion to dismiss for lack of subject-matter jurisdiction, the court may consider evidence outside the pleadings without converting the motion into one for summary judgment. See, e.g., Evans, 166 F.3d at 647.

## A.

Federal courts "are not at liberty to resolve every grievance over government policy, no matter how significant" to the plaintiffs. Doe v. Obama, 631 F.3d 157, 160 (4th Cir. 2011). To invoke the power of a federal court, plaintiffs must demonstrate that they have standing under Article III of the Constitution. See id. Absent Article III standing, the court lacks subject-matter jurisdiction to hear plaintiffs' claims. See White Tail Park, Inc. v. Stroube, 413 F.3d 451, 458–59 (4th Cir. 2005). To establish Article III standing, a plaintiff must show that "(1) [the plaintiff] has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000); see Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992); Doe, 631 F.3d at 160. These requirements are "the irreducible constitutional minimum of standing." Lujan, 504 U.S. at 560.

The first element requires a plaintiff to demonstrate an injury in fact to a "legally protected interest." Id. Additionally, the injury in fact "must be concrete in both a qualitative and temporal sense." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990); see Beck v. McDonald, 848 F.3d 262, 271 (4th Cir. 2017). When an injury is threatened, that injury must be "certainly impending." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (emphasis omitted). "'Allegations of possible future injury' are not sufficient." Id. (emphasis omitted) (quoting Whitmore, 495 U.S. at 158). The "certainly impending" requirement ensures "that the alleged injury is not too speculative for Article

III purposes." Lujan, 504 U.S. at 564 n.2; see Beck, 848 F.3d at 271. When a plaintiff seeks injunctive relief, the plaintiff's injury in fact requires more than simply an allegation of past exposure to illegal conduct. See, e.g., Lujan, 504 U.S. at 563–64; City of Los Angeles v. Lyons, 461 U.S. 95, 101–06 (1983); Suhre v. Haywood Cty., 131 F.3d 1083, 1090–91 (4th Cir. 1997). A plaintiff must show a substantial likelihood of a "real or immediate threat that [she] will be wronged again." Lyons, 461 U.S. at 111.

Plaintiffs have failed to show that they have suffered or imminently will suffer an injury in fact to a legally protected interest. Plaintiffs have not shown that they have a legally protected interest in receiving enhanced rates, and plaintiffs have not shown that defendants violated any procedural rights in rejecting plaintiffs' requests for enhanced rates. Moreover, plaintiffs' injuries are too speculative under Article III. Plaintiffs argue that they will be institutionalized if the enhanced rates are not approved. Assuming that institutionalization is an injury, this injury depends on the occurrence of multiple preceding events, including that plaintiffs' caregivers quit, that plaintiffs cannot timely locate replacements, and that no feasible alternatives to institutionalization exist. The role of the provider further complicates the standing analysis because plaintiffs fail to establish that, if the providers receive an enhanced rate, this rate will translate into larger payments for plaintiffs' caregivers. This fact compounds the speculative nature of plaintiffs' alleged injury.

In opposition, plaintiffs cite Guggenberger v. Minnesota, 198 F. Supp. 3d 973 (D. Minn. 2016). In Guggenberger, however, the plaintiffs alleged that they were "currently lacking necessary supports and services" because they were on a Medicaid waiver waiting list. See id. at 992. By contrast, plaintiffs have not demonstrated that they are presently lacking any supports or services. Plaintiffs were approved for all services that they require. Furthermore, plaintiffs do not allege that they have been deprived of any medically necessary care. Accordingly, plaintiffs have failed to

8

establish an injury in fact, and therefore do not have standing.

Even assuming that plaintiffs alleged an injury in fact, plaintiffs fail to show that defendants caused plaintiffs' injury in fact or that a favorable decision will redress their injury. For an injury to satisfy the redressability prong of Article III standing, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at 561 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41–42 (1976)); see United States v. Batato, 833 F.3d 413, 422 (4th Cir. 2016). The asserted injury also must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (alterations and quotation omitted). Plaintiffs' injury depends on the possible conduct of their caregivers. Although plaintiffs' caregivers have indicated that they might quit, there is no guarantee that their caregivers will quit if the enhanced rate is not approved or that their caregivers will stay if the enhanced rate is approved. In fact, plaintiffs' caregivers did not quit during 2018 even after defendants did not approve plaintiffs' requests for enhanced rates. Moreover, New Beginnings (or any other provider) is not a party, and it is speculative whether approving an enhanced rate for payment to New Beginnings would result in higher pay for plaintiffs' caregivers. Thus, plaintiffs' alleged injury depends on the conduct of third parties not before the court, is speculative, and may not be redressed by a favorable ruling. Accordingly, plaintiffs fail to establish that they have standing to assert their claims, and the court grants defendants' motions to dismiss.

B.

Alternatively, defendants argue that plaintiffs' claims are not ripe. "The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form." Miller v. Brown, 462 F.3d 312, 318–19 (4th Cir. 2006) (quoting Rescue Army v. Mun. Court

9

of L.A., 331 U.S. 549, 584 (1947)); see Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 269–70 (4th Cir. 2013); Lansdowne on the Potomac Homeowners Ass'n v. OpenBand at Lansdowne, LLC, 713 F.3d 187, 198 (4th Cir. 2013). The purpose of the ripeness doctrine "is to require courts to avoid taking premature judicial action, thereby preventing them from becoming entangled in abstract disagreements." Scoggins, 718 F.3d at 270 (quotation omitted). In considering whether a claim is ripe, courts balance "the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." Miller, 462 F.3d at 319 (quotation omitted). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (quotations omitted); see Scoggins, 718 F.3d at 270; Miller, 462 F.3d at 319. The hardship prong "is measured by the immediacy of the threat and the burden imposed on the plaintiff." Lansdowne, 713 F.3d at 199 (quotation and alteration omitted). "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." Doe v. Va. Dep't of State Police, 713 F.3d 745, 758 (4th Cir. 2013); see Franks v. Ross, 313 F.3d 184, 195 (4th Cir. 2002).

As for the first prong, on July 1, 2018, New Beginnings ceased to be plaintiffs' provider. Plaintiffs' current providers have not submitted requests for enhanced rates. See Am. Compl. [D.E. 36] ¶¶ 134, 152. Therefore, plaintiffs' claims concerning their risk of institutionalization depend on a future event—i.e., the new providers requesting enhanced rates—that may not occur. As for the second prong, plaintiffs' alleged injury is too speculative to be considered a hardship to plaintiffs. Plaintiffs have not alleged that they have experienced a loss of medically necessary services as a result of not receiving the enhanced rates. Moreover, it is unclear how imminent the risk of institutionalization is for plaintiffs. For example, plaintiffs' caregivers did not quit even without the

enhanced rates. Balancing the fitness of the issues for adjudication against the hardship to plaintiffs, the court finds that plaintiffs' claims are not ripe. Accordingly, the court grants defendants' motions to dismiss. Because plaintiffs' claims are not justiciable, the court does not reach the merits of plaintiffs' claims.

### III.

In sum, the court GRANTS defendants' motions to dismiss [D.E. 40, 42] and DISMISSES the complaint without prejudice. The court DENIES AS MOOT defendants' first motions to dismiss [D.E. 23, 26].

SO ORDERED. This 25 day of February 2019.

JAMES C. DEVER III
United States District Judge